# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

| | |
|---|---|
| AVERA MCKENNAN, | |
| Plaintiff, | No.  C18-4010-LTS |
| vs. | **ORDER ON BENEFITS** |
| | **CLAIM REVIEW** |
| MEADOWVALE DAIRY EMPLOYEE BENEFIT PLAN and MEADOWVALE DAIRY, LLC., | |
| Defendants. | |

_____

## I.    INTRODUCTION

Plaintiff Avera McKennan (Avera), as assignee of Juan Pablo Garcia Marquez a/k/a Gilberto Fuentes (Marquez), seeks judicial review of the denial of Marquez's claim for benefits under the Meadowvale Dairy Employee Benefit Plan (the Plan), which is administered by Meadowvale Dairy, LLC (Meadowvale).  This Court has jurisdiction to review Meadowvale's denial of Marquez's claim under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ et seq.  Oral argument is not necessary.  *See* N.D. Iowa L.R. 7(c).

## II.    PROCEDURAL HISTORY

Avera, a South Dakota nonprofit corporation that operates a hospital in Sioux Falls, South Dakota, filed its complaint (Doc. No. 1) on February 12, 2018.  After I denied the defendants' motion to dismiss for lack of standing and failure to exhaust administrative remedies, the parties submitted merits briefs (Doc. Nos. 27, 40, 47) and

filed a joint administrative record.[1]  Doc. Nos. 22, 40-1.  This matter is now ready for a decision.

## III.  BACKGROUND FACTS

The Plan is a self-insured employee benefits plan.  Doc. No. 17 at ¶ 3. Meadowvale, an Iowa corporation with its principal place of business in Rock Valley, Iowa, sponsored the Plan on December 1, 2014.  *Id*. at ¶ 6; Doc. No. 17-3.  The Plan was subsequently amended and restated on February 10, 2016, with an effective date of December 1, 2015.  Doc. Nos. 17 at ¶ 6; Doc. No. 17-1; Doc. No. 17-2.  The Plan is intended to qualify as a welfare benefit plan under ERISA.  Doc. No 17-3 at 2.  Under the terms of the Plan,

> A full-time Employee of the Employer who regularly works 30 or more hours per week will be eligible for coverage under this Plan once he/she completes a waiting period of 60 days from the date he or she completes at least one hour of service with the Employer.  Participation in the Plan will begin as of the first day of the month following completion of the waiting period provided all required election and enrollment forms are properly submitted to the Plan Administrator.

Doc. No. 17 at ¶ 7.  Coverage begins "as of the first day of the month following completion of the waiting period provided all required election and enrollment forms are properly submitted to the Plan administrator."  *Id*. at ¶ 8.

Marquez was employed by Meadowvale from September 30, 2015, until January 2016, when he began receiving treatment for Guillain-Barre Syndrome, a rapid-onset muscle weakness disease that ultimately left Marquez paralyzed.  *Id*. at ¶¶ 9-11.  Marquez

---

[1] The joint record contains Exhibits A (Doc. No. 17-1), B (Doc. No. 17-2), C (Doc. No. 17-3), D (Doc. No. 17-4), 1 (Doc. No. 18-1), 3 (Doc. No. 18-3), 4 (Doc. No. 18-4), and 5 (Doc. No. 18-5).  The defendants also ask that I consider Exhibits 2 (Doc. No. 18-2), 6 (Doc. No. 21-1), 7 (Doc. No. 21-2) and 8 (Doc. No. 21-3).  Avera disputes that these documents are properly part of the administrative record subject to review in this proceeding.  Because the Administrative Record was not submitted with unified page numbering, I will refer to documents in the Administrative Record by referencing their docket and page numbers.

was treated at Avera, where he incurred medical expenses in the amount of $760,713.45, excluding interest, prior to his death. *Id.* at ¶ 12. As a full-time employee of Meadowvale, Marquez enrolled in the Plan. *Id.* at ¶ 10. As a result, the Plan submitted payment for some of Marquez' medical expenses. *Id.* at 14.

While Marquez was being treated, it was discovered that he was an undocumented immigrant and that he had enrolled in the Plan using a false name and social security number. On April 12, 2016, the Administrator – through Meadowvale CFO Nathan Jansen – sent Marquez a letter stating "effective May 13 your coverage under the Plan will be rescinded retroactive to 9/30/15." *Id.* at ¶ 15. The proffered reason for rescinding coverage was that Marquez had falsely misrepresented his identity to Meadowvale. Doc. No. 13-1 at 12.

The Plan permits rescission of coverage on the following terms:

**Termination of Employee Coverage**

Coverage under the Plan will terminate on the earliest of the following dates:

***

(4)     The end of the month in which you cease to be eligible for coverage under the plan.

(5)     The end of the month in which you terminate employment or cease to be included in an eligible class of Employees.

(6)     The date you (or any person seeking coverage on your behalf) performs an act, practice or omission that constitutes fraud.

(7)     The date you (or any person seeking coverage on your behalf) makes an intentional misrepresentation of a material fact.

Doc. No. 17-1 at 14.

**Retroactive Termination of Coverage**

Except in cases where you fail to pay any required contribution to the cost of coverage, the Plan will not retroactively terminate coverage under the Plan unless you (or a person seeking coverage on your behalf) performs an act, practice, or omission that constitutes fraud with respect to the Plan or

3

unless the individual makes an intentional misrepresentation of material fact. In such cases, the Plan will provide at least 30 days advance written notice to the individual affected before coverage will be retroactively terminated. As provided above, coverage may be retroactively terminated in cases where required employee contributions have not been paid by the applicable deadline. In those cases, no advance written notice is required.

*Id*.

Avera is the assignee of Marquez' rights under the Plan. Doc. No. 17 at ¶ 1. On May 10, 2016, Marquez purported to assign "all of [his] rights, remedies, benefits . . . as well as any and all causes of action that [he] might have now or in the future against any Payer to the extent of [his] medical charges, the right to prosecute such cause of action either in [his] name or in the name of Avera" by signing a document entitled "Partial Assignment of Cause of Action, Assignment of Proceeds, Contractual Lien and Treatment Agreement" (the Assignment). *Id*. at ¶ 15; *see also* Doc. No. 17-4. The relevant language of the assignment is as follows:

> **Partial Assignment of the Cause of Action, Assignment of Proceeds and Contractual Lien:** I hereby assign, in so far as permitted by law, all of my rights, remedies, benefits to the office as well as any and all causes of action that I might have now or in the future against any Payer to the extent of my medical charges, the right to prosecute such cause of action either in my name or in the name of Avera, and the right to settle or otherwise resolve such causes of action for my medical charges as Avera sees fit. I further assign my right to receive any proceeds from any Payer to Avera and further grant a contractual lien to Avera with respect to any medical charges. . . . I understand these assignments of rights and contractual lien may effectuate, automatically or otherwise, a secured interest under the applicable uniform commercial code. I intend for this agreement to effectuate such a lien and hereby authorize Avera to file the form(s) normally filed with the secretary of state and other governmental agency in order to perfect such lien. Except as provided herein, nothing in this agreement shall be construed as an election or waiver by Avera to a secured interest under any other statutory lien law.

Doc. No. 17-4 at 1.

The Assignment is signed "Juan Pablo x GM." *Id.* at 4. The Assignment was actually signed by Marquez' mother, Graciela Marquez, either pursuant to a medical power of attorney or at Marquez' direction. Marquez additionally signed a Durable Power of Attorney for Health Care Decisions granting Graciela the ability to make health care decisions (*Id.* at 5); an Authorization for Release of Protected Health Information to Nominated Health Care Attorney-In-Fact (*Id.* at 6); and a form granting Marquez' "agent," among other powers, "the power and authority to serve as my personal representative for all purposes of the Health Insurance Portability and Accountability Act of 1996."[2] *Id.* at 7.

Following assignment, Avera attempted to comply with the internal appeals process. Doc. Nos. 18-1. Avera first contacted the Administrator on July 21, 2016, to request, in accordance with 29 U.S.C. § 1024(b), the documents it would need to appeal the adverse benefit determination. *Id.* at 16-18. It appears that Avera's representative did not identify to Meadowvale that he was acting on behalf of Avera at that time. *Id.* at 16 ("Our firm has been retained by [Marquez] . . ."). The Administrator denied the request for documentation, citing a lack of proper written authorization by the beneficiary. *Id.* at 21.

The Plan provides that beneficiaries such as Marquez may appoint a representative to contact the administrator to resolve a claim dispute:

> A Covered Person is permitted to appoint an authorized representative to act on his or her behalf with respect to a benefit claim or appeal of a denial. An assignment of benefits by a Covered Person to a provider will not constitute appointment of that provider as an authorized representative. To appoint such a representative, the Covered Person must complete a form which can be obtained from the Plan Administrator or the Third-Party Administrator. However, in connection with a claim involving urgent care,

---

[2] Page 7 of Doc. No. 17-4 begins mid-sentence, and the sentence does not appear to link to any of the other pages provided by any of the parties to this case. Therefore, it is difficult to determine the identity of the "agent" referenced on this page or the full scope of the authorization on this page.

the Plan will permit a health care professional with knowledge of the Covered Person's medical condition to act as the Covered Person's authorized representative without completion of this form.

AR 48. Avera responded on September 12, 2016, with a copy of the Assignment as well as all other documents referenced above, arguing that it did in fact have authorization to request the documentation on behalf of Marquez. *Id.* at 23. Although the Administrator denied that the Assignment was valid or enforceable, it produced the documents on September 30, 2016. *Id.* at 44-45. There is a dispute as to whether the production of documents was timely. Nevertheless, Avera submitted an appeal to the Administrator within the Plan's 180-day deadline on October 6, 2016. *Id.* at 2-9. Meadowvale denied the appeal on October 31, 2016, and denied a secondary appeal on December 16, 2017.

According to the denial of benefits appeal decision, authored by Meadowvale CEO Sjerp Ysselstein, Avera's appeal was denied for three reasons:

> First, Avera has no right to pursue this appeal because it is not an authorized representative of Mr. Marquez/Fuentes. An authorized representative is one who "has been authorized to act **on behalf of a claimant** . . ." 29 C.F.R. § 2560.503-1(b)(4) (emphasis added). The Plan states that assignment of benefits to a medical provider does not constitute appointment of that provider as an authorized representative. *See* Meadowvale Dairy Employee Benefit Plan, Plan Document and Summary Plan Description p. 57. Instead, the Covered Person must complete a form to designate an authorized representative. *Id.* Since no form was completed, Avera is not authorized to act on behalf of Mr. Marquez/Fuentes or his estate.

> Second, the assignment that Avera has submitted as part of this appeal is not valid. It was not signed by Mr. Marquez/Fuentes, and the person who allegedly signed it on his behalf did not have the power to do so. The power of attorney submitted by Avera in support of this assignment was limited to health care decisions only, and was only effective if Mr. Marquez/Fuentes was "unable, in the judgment of [his] attending physician, to make . . . health care decisions." Further, Meadowvale believes this power of attorney is invalid under Iowa law because it was witnessed by an Avera employee. *See* Iowa Code. Ann. § 144B.3.

Finally, the appeal is denied because Mr. Marquez/Fuentes submitted a false name and social security number to Meadowvale. The Plan specifically states that coverage will be terminated on the date that an employee "performs an act, practice, or omission that constitutes fraud" or "makes an intentional misrepresentation of a material fact. *See* Meadowvale Dairy Employee Benefit Plan, Plan Document and Summary plan Description p. 21. Retroactive rescission under these circumstances is permitted under federal law. 45 C.F.R. 147.128(a)(1).

Mr. Marquez/Fuentes' lack of proper documentation also means that Meadowvale could not have legally employed him. As the Meadowvale Dairy Employee Benefit Plan only covers employees of Meadowvale, it is clear that Mr. Marquez/Fuentes made an intentional misrepresentation of a material fact that constitutes fraud.

Doc. No. 18-3 at 1-2. The resolution of the second appeal, authored by Ysselsteins' wife, Natalie Ysselstein, was substantially identical.

According to the Plan's provisions, the Plan was required to follow these procedures in resolving an appeal:

**Internal Review of Initially Denied Claims**

If you submit a claim for Plan benefits and it is initially denied . . . you may request a review of that denial under the procedures described below.

You have 180 days after you receive notice of an initial adverse determination within which to request a review of the adverse determination. For a request for a second level appeal, you have 60 days after you receive notice of an adverse determination at the first level of appeal to request a second level appeal of the adverse determination.

If you request a review of an adverse determination within the applicable time period, the review will meet the following requirements:

(1)     The Plan will provide a review that does not afford deference to the adverse determination that is being appealed and that is conducted by an appropriate named fiduciary of the Plan who did not make the adverse determination that is the subject of the appeal and who is not a subordinate of the individual who made that adverse determination.

***

(4)     The reviewer will afford you an opportunity to review and receive, without charge, all relevant documents, information and records

7

relating to the claim and to submit issues and comments relating to the claim in writing to the Plan. The reviewer will take into account all comments, documents, records and other information submitted by the claimant relating to the claim regardless of whether the information was submitted or considered in the initial benefit determination.

(5) You will be provided, free of charge, any new or additional evidence or rationale considered, relied upon or generated by the Plan in connection with the claim. Such evidence or rationale will be provided as soon as possible and sufficiently in advance of the Plan's deadline for providing notice of its determination on review to give you a reasonable opportunity to respond prior to such determination.

(6) The Plan will ensure that all claims are adjudicated in a manner designed to ensure the independence and impartiality of the person involved in making the decisions.

(7) The Plan will provide you with continued coverage pending the outcome of an internal appeal.

Doc. No. 17-1 at 45-46.

## IV. APPLICABLE LAW

"ERISA provides a plan beneficiary with the right to judicial review of a benefits determination." *Shelton v. ContiGroup Cos., Inc.*, 285 F.3d 640, 642 (8th Cir. 2002) (citation omitted). "When a plan gives discretion to the plan administrator,[3] then a plan

---

[3] The parties agree that the Plan gives discretion to the Plan Administrator:

It is the express intent of this Plan that the Plan Administrator will have maximum legal discretionary authority to construe and interpret the terms and provisions of the Plan, to make determinations regarding issues which relate to eligibility for benefits (including the determination of what services, supplies, care and treatments are Experimental and/or Investigational), to decide disputes which may arise relative to your rights and to decide questions of Plan interpretation and those of fact and law relating to the Plan. The decisions of the Plan Administrator as to the facts related to any claim for benefits and the meaning and intent of any provision of the Plan or its application to any claim, shall receive the maximum deference provided by law and will be final and binding on all interested parties.

Doc. No. 17-1 at 69.

administrator's decision is reviewed judicially for an abuse of discretion." *Ortlieb v. United HealthCare Choice Plans*, 387 F.3d 778, 781 (8th Cir. 2004).

"Under an abuse of discretion standard of review, a plan administrator's decision will stand if reasonable; i.e., supported by substantial evidence." *Id.* (citation omitted). "Substantial evidence is more than a scintilla but less than a preponderance." *Id.* When the adverse decision rests upon an interpretation of the terms of the plan, courts must consider:

> [W]hether their interpretation is consistent with the goals of the Plan, whether their interpretation renders any language in the Plan meaningless or internally inconsistent, whether their interpretation conflicts with the substantive or procedural requirements of the ERISA statute, whether they have interpreted the words at issue consistently, and whether their interpretation is contrary to the clear language of the Plan.

*Finley v. Special Agents Mut. Ben. Ass'n, Inc.*, 957 F.2d a617, 621 (8th Cir. 1992). "While these non-exhaustive factors 'inform our analysis,' the ultimate question remains whether the plan interpretation is reasonable." *Peterson on behalf of E. v. UnitedHealth Group, Inc.*, 913 F.3d 769, 775-76 (8th Cir. 2019) (citation omitted). Finally, "when a conflict of interest exists because the plan administrator is both the decision-maker and the insurer, we take that conflict into account and give it some weight in the abuse-of-discretion calculation." *Nichols v. Unicare Life & Health Ins. Co.*, 739 F.3d 1176, 1181 (8th Cir. 2014) (citation omitted).

## V.    DISCUSSION

### A.    Preliminary Issues

The parties dispute a number of preliminary matters. Avera argues that Meadowvale is not entitled to abuse of discretion review due to its procedural irregularities and a financial conflict of interest as the Plan Administrator. The parties dispute which exhibits I may consider in resolving this matter. Meadowvale disputes whether Avera has standing to bring this claim; and contends that Avera has not exhausted

its remedies prior to bringing this suit and that Avera is barred from recovery because it has unclean hands.

### 1. *Admission of Disputed Exhibits*

The parties dispute whether four exhibits belong in the administrative record. Exhibits 6 and 7 (Doc. Nos. 21-1 and 21-2) are copies of Meadowvale's Stop Loss Insurance Policy. Exhibit 8 (Doc. No. 21-3) is Marquez' personnel file. Exhibit 2 (Doc. No. 18-2) is the declaration of Meadowvale CEO Ysselstein, which describes a document Meadowvale contends Avera needed to file to exhaust Marquez' claim. Meadowvale claims that Exhibits 6 and 7 are admissible for the limited purpose of determining the proper standard of review in this case and that Exhibit 8 is admissible because it was reviewed in making Marquez' benefits determination. Exhibit 2 is offered to establish that Avera did not exhaust administrative remedies.

Review for abuse of discretion "focuses on whether the administrator's decision was supported by . . . substantial evidence in the materials considered by the administrator." *Waldroch v. Medtronic*, 757 F.3d 822, 829 (8th Cir. 2014) (citation omitted). Thus, "generally a reviewing court must focus on the evidence available to the plan administrators at the time of their decision and may not admit new evidence or consider post hoc rationales." *Id.* at 829-30 (citation omitted). One exception is when evidence is admitted for the limited purpose of determining the proper standard of review. *Id.* Because the standard of review is in dispute in this case, I will consider the stop-loss insurance policies (Exhibits 6 and 7) for the limited purpose of determining the proper standard of review. Exhibit 2 will also be admitted for the limited purpose of considering whether Avera exhausted administrative remedies. Finally, Avera does not explain its objection to Exhibit 8. There is no evidence suggesting that Marquez' personnel file was not available to the plan administrators at the time they made their decision regarding his claim benefits. As such, I will consider Exhibit 8 to the extent that it is relevant.

### 2. *Standard of Review*

Avera argues for a less-deferential standard of review because of a "serious procedural irregularity in the Plan's decision-making progress." Doc. No. 27 at 12. Specifically, Avera argues that the internal appeal of Marquez' denial of benefits was tainted by the fact that there was a close relationship between the three people who reviewed and denied Marquez' application for benefits (first the company CFO, then the company's CEO, and then the CEO's wife), and that the second level of review consisted of nothing more than "copy[ing] and past[ing] the first appeal into the second appeal. *Id.* at 12-13, see also Doc. No. 19 at 5 ("The resolution of the second appeal was substantially identical."). According to Avera, the close relationship between the reviewers meant that Marquez did not receive a "full and fair review of a claim and adverse benefit determination" as required under 29 C.F.R. § 2560.503-1(h)(3)(ii). Meadowvale responds, with various arguments related to its internal procedures, its stop-loss insurance policy and the availability of outside review of its plan, that there was no conflict of interest resolving Marquez's claim.

Ultimately, the conflict of interest and procedural irregularity do not require that I review Meadowvale's decision under a less-deferential standard. Instead, the conflict, if it exists, must "be weighed as a 'factor in determining whether there is an abuse of discretion'" in denying the claim benefit. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 115 (citing Firestone, 489 U.S. at 115).

The conflict of interest in this case is clear. First, an inherent "conflict of interest exists whenever the plan administrator is also the employer or insurance company which ultimately pays benefits." *Hackett v. Standard Ins. Co.*, 559 F.3d 825, 830 (8th Cir. 2009). Meadowvale argues that the fact it is the administrator and the responsible party in this case does not require a finding that there is a conflict of interest because "[h]ad the Plan Administrator determined that Marquez's claim for benefits should be allowed, Meadowvale LLC could still make a separate and independent determination of whether to fund benefits." Doc. No. 40 at 24. This argument is nonsensical – the fact that

Meadowvale could choose not to pay benefits despite a duty to do so under its Plan does not mitigate this conflict. Instead, it demonstrates the reason courts have held that companies like Meadowvale are inherently conflicted. Meadowvale's arguments involving stop-loss insurance coverage that would limit its liability to the deductible (and thus its motive to provide less-than-adequate review of claims for benefits) similarly does not demonstrate that Meadowvale complied with its duty to provide a "full and fair review of a claim and adverse benefit determination."

Second, the administrative record itself raises questions as to whether Marquez received a full and fair review of his claim. Meadowvale does not address Avera's argument that the initial denial (by CFO Jensen) was reviewed by his superior, CEO Ysselstein, and that the second level of review was conducted by Mr. Ysselstein's wife. Nor has Meadowvale addressed the fact that Mrs. Ysselstein's written review of the claim consisted of nothing more than copy-pasting Mr. Ysselstein's written review of the claim. 29 C.F.R. § 2560.503-1(h)(3)(ii) requires plan administrators to "provide for review that does not afford deference to the initial adverse benefit determination and that is conducted by [a] . . . fiduciary . . . who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual." The close relationship between those who issued the adverse benefits decision in this case, combined with the fact that the second-level review was clearly not de novo, raise an inference that the conflict of interest affected the decision-making process.

Meadowvale also attempts to argue that its plan administrators – Jensen and the Ysselsteins – would not have rendered a decision tainted by a conflict of interest because "any administrator would have known, during internal review, that any decision *could* be appealed externally," through the state of Iowa's external review process. Doc. No. 40 at 23. However, this external review process is not mandatory under either the regulations or the Plan. *See* 29 C.F.R. 2560.503-1(c)(2) ("The claims procedure of a group health plan will be deemed to be reasonable only if . . . the claims procedures do not contain any provision, and are not administered in a way, that requires a claimant to

file more than two appeals of an adverse benefit determination prior to bringing a civil action."). Meadowvale cannot rely on a voluntary, external procedure to comply with its responsibilities under federal law for providing a fair internal procedure.

Simply put, a conflict of interest exists in this case. I will consider this conflict and the effect it may have had on Marquez' benefit determination when deciding whether Meadowvale abused its discretion in denying benefits.

### 3.    *Standing (Again)*

For the second time, Meadowvale asks me to address Avera's standing to bring this claim. *See* Doc. No. 40 at 36-53. Much of Meadowvale's arguments repeat the same issues I have addressed. Nevertheless, I will (briefly) address each of Meadowvale's arguments related to standing and exhaustion.

### a.    *The Assignment was not properly executed.*

Meadowvale argues that Avera does not have standing because the Assignment was not properly executed by Marquez, and that I should give deference to the Plan Administrator's finding of fact on that issue. As discussed above, the Assignment was signed "Juan Pablo x GM." Doc. No. 17-4 at 4. Avera represented to Meadowvale that the Assignment was executed by Graciela "as [Marquez'] attorney in fact. Doc. No. 18-1 at 23. Meadowvale denied Avera's right to pursue the internal appeal because it believed the Assignment was "not valid":

> It was not signed by Mr. Marquez/Fuentes, and the person who allegedly signed it on his behalf did not have the power to do so. The power of attorney submitted by Avera in support of this assignment was limited to health care decisions only, and was only effective if Mr. Marquez/Fuentes was "unable, in the judgment of [his] attending physician, to make . . . health care decisions." Further, Meadowvale believes this power of attorney is invalid under Iowa law because it was witnessed by an Avera employee. *See* Iowa Code Ann. § 144B.3.

Doc. No. 18-3 at 1.

First, as it weighs on the issue of standing, Meadowvale's findings as to the proper execution of the Assignment are not entitled to deference. Standing is an issue of jurisdiction. Meadowvale cannot avoid jurisdiction over this case by interpreting the law to deprive an adverse party of standing. Second, as it relates to the issue of the merits determination in this case, Meadowvale is not entitled to deference in its determination that the Assignment was not properly executed, as this question is not within the scope of discretion granted to it under the Plan. Whether an assignment of a cause of action was properly executed is not an issue of Plan interpretation, nor is it a fact related to Marquez' eligibility for benefits. See Doc. No. 17-1 at 69 (grant of discretion). Rather, the proper execution of the Assignment is a question of law.

Even if this were an area in which Meadowvale were afforded deference, the finding that the Assignment was not properly executed is not supported by substantial evidence. Meadowvale deemed the Assignment improperly executed because Graciela was appointed Marquez' *medical* power of attorney, an appointment that does not include authorization to make non-medical decisions. However, a "power of attorney" is not the only source of authority for one person to sign a contract (such as the Assignment) on behalf of another. If Graciela signed the Assignment at Marquez' direction, she was acting as his agent:

> A fundamental principle of agency law is that whatever an agent does, within the scope of his or her actual authority, binds the principal. In addition, all acts and contracts of an agent, which are within the apparent scope of authority conferred on him or her, are also binding upon the principal.

*Magnussen Ag. v. Pub. Entity Nat'l. Co-MidWest*, 560 N.W.2d 20, 25 (Iowa 1997) (citations omitted).

Meadowvale did not address any of the evidence that Graciela was acting as Marquez' agent. Although Avera informed Meadowvale that the Assignment was signed by Graciela "both at the direction of her son, Mr. Marquez, and pursuant to the Power of Attorney," Doc. No. 18-1, Meadowvale did not acknowledge that by signing the

Assignment at Marquez' direction, Graciela (the agent) was acting with both the express and actual authority of Marquez (the principal). *See* Restatement (Third) of Agency § 3.01 (2006) ("Actual authority, as defined in § 2.01, is created by a principal's manifestation to an agent that, as reasonably understood by the agent, expresses the principal's assent that the agent take action on the principal's behalf."). "A plan administrator abuses its discretion when it ignores relevant evidence." *Wilcox v. Liberty Life Assur. Co. of Boston*, 552 F.3d 693, 701 (8th Cir. 2009). This argument against Avera's standing to bring the case fails.

### b. The Assignment only conveyed an interest in an unmatured cause of action, which was never properly exhausted.

Meadowvale next argues that Avera does not have standing because, at the time of the Assignment, Marquez did not have a "cause of action" to assign to Avera for ERISA benefits, as the Plan's remedies had not yet been exhausted under 29 U.S.C. § 1132(a)(1)(B). Meadowvale claims that the "cause of action" Marquez conveyed never accrued as Marquez died before his claim was exhausted and Avera could not exhaust Marquez' claim under the Plan. *See* Doc. No. 40 at 40. Further, Meadowvale contends that under South Dakota law the assignment of an unripe cause of action does not permit the assignee to control litigation of the cause of action.

I have already addressed these issues in a previous ruling. South Dakota does not prohibit assigning the right to a cause of action that arises under a contract. *See* Doc. No. 19 at 9. In such circumstances, the assignee has "the right to sue for breach of contract in [its] own name." *Grady v. Commers Interiors, Inc.*, 268 N.W.2d 823, 825 (S.D. 1978). The Assignment was effective to give Avera standing under *Lutheran Med. Ctr. Of Omaha v. Contractors, Laborers, Teamsters and Engineers Health and Welfare Plan*, 25 F.3d 616, 619 (8th Cir. 1994), *abrogated on other grounds in Martin v. Ark. Blue Cross and Blue Shield*, 229 F.3d 966 at 979-71 (8th Cir. 2002). Denying standing in cases such as this would "undermine the goal of ERISA." *Id.*

Turning to the exhaustion issue, although Avera may not have filed the proper form under the Plan indicating that it was appointed by Marquez to resolve the administrative appeals of his claim, I have already held that Avera nevertheless exhausted Marquez' administrative remedies because Meadowvale "processed Marquez' claim in the same way it would process any other claim and, as a result, there exists an administrative record from which I can evaluate the merits of Marquez' claim." Doc. No. 19 at 12 (*citing Young v. UnumProvident Corp.*, No. Civ.01-2420 DWF/AJB, 2002 WL 2027285 (D. Minn. Sept. 3, 2002) (although plaintiff used an improper form, the claim was exhausted because the Administrator accepted and processed the appeal despite the error such that further administrative review would have been futile); *Theil v. United Healthcare of Midlands, Inc.*, No. 8:00CV426, 2001 WL 574637 (D. Neb. Jan. 23, 2001) (purposes of the exhaustion requirement were satisfied because the Administrator considered and decided the appeal despite the use of incorrect appeal procedures)).

Meadowvale argues that deeming Marquez' claim exhausted expands the futility rule beyond its intended reach. The Eighth Circuit has construed the futility exception to the rule requiring exhaustion narrowly:

> Chorosevic's last argument in regard to the exhaustion-of-remedies defense is that additional efforts to exhaust would have been "wholly futile." This "narrow" exception to the exhaustion-of-remedies requirement requires a plan participant to show that it is certain that her claim will be denied on appeal, not merely that she doubts that an appeal will result in a different decision. Unsupported and speculative claims of futility do not excuse a claimant's failure to exhaust his or her administrative remedies.

*Chorosevic v. MetLife Choices*, 600 F.3d 934, 945 (8th Cir. 2010) (cleaned up). In *Chorosevic*, the beneficiary failed to file an internal appeal and, as a result, the Plan Administrator did not have an opportunity to reconsider the initial denial of benefits. This case is distinguishable. Although Meadowvale denied Avera's right to pursue administrative exhaustion, Meadowvale nevertheless issued a decision on the merits that Marquez was not entitled to benefits under the plan and allowed Avera to appeal that

decision. Further administrative action is unnecessary. This argument against Avera's standing fails.

### c. Under South Dakota Law, the partial assignment grants Avera only a security interest, which is not yet perfected.

Meadowvale's second argument that Avera does not have standing is based on contract interpretation. It contends that the Assignment should be interpreted to provide Avera with only a security interest because the Assignment's expressed intent to both convey a security interest and a cause of action are mutually exclusive, thus creating an ambiguity that should be construed against Avera. Finally, Meadowvale contends that a mere security interest does not give Avera the right to pursue this claim against Meadowvale because Avera cannot prove its right to recover an unsatisfied debt.

Meadowvale's argument on this ground is unsupported. As I have previously stated, "[t]here is no rule against a single contract granting a lien and assigning a cause of action[,] and it is clear that this particular contract intended to do both." Doc. No. 45 at 7. Meadowvale cites no authority prohibiting a contract from conveying multiple types of interests in the alternative. This particular contract unambiguously did so. In effect, the Assignment gave Avera a choice of remedies to collect the payment owed to it in the event that Marquez' medical condition took one of many possible turns. This argument against Avera's standing is denied.

### d. Avera is barred from recovery under the doctrine of unclean hands

Meadowvale argues that the "unclean hands" doctrine would have barred Marquez from receiving benefits under the Plan because he obtained coverage under the plan by fraud. Meadowvale contends that because Avera stands in the shoes of Marquez as his assignee, and because Avera uncovered the fraud and nevertheless acted under "an assignment of rights which were originally obtained under false pretenses," Doc. No. 40 at 35, Avera's recovery is similarly barred.

The Iowa Supreme Court has described the unclean hands doctrine as follows:

> The equity maxim of clean hands
>
> expresses the principle that where a party comes into equity for relief he or she must show that his or her conduct has been fair, equitable, and honest as to the particular controversy in issue. A complainant will not be permitted to take advantage of his or her own wrong or claim the benefit of his or her own fraud or that of his or her privies.

27A Am. Jur. 2d *Equity* § 126, at 605 (1996).

> The maxim means
>
> that whenever a party who seeks to set the judicial machinery in motion and obtain some equitable remedy has violated conscience or good faith, or another equitable principle in prior conduct with reference to the subject in issue, the doors of equity will be shut, notwithstanding the defendant's conduct has been such that in the absence of circumstances supporting the application of the maxim, equity might have awarded relief.

*Id.*

> What underlies the maxim is the principle that "equity will not aid an applicant in *securing* or *protecting* gains from wrongdoing or in escaping its consequences." *Id.* at 605-06 (emphasis added). The maxim "is ordinarily invoked to protect the integrity of the court where granting affirmative equitable relief would run contrary to public policy or lend the court's aid to fraudulent, illegal or unconscionable conduct." *Myers v. Smith*, 208 N.W.2d 919, 921.

*Opperman v. M. & I. Dehy, Inc.*, 644 N.W.2d 1, 6 (Iowa 2002).

Meadowvale relies heavily on *Ellenburg v. Brockway, Inc.*, 763 F.2d 1091 (9th Cir. 1985), in arguing that Avera is barred from recovery. In *Ellenburg*, the Ninth Circuit Court of Appeals held that an ERISA claimant who had lied about his age to obtain early retirement benefits was barred from recovery in a suit brought to gain those same retirement benefits. *Id.* For several reasons, this case is distinguishable. First, Marquez did not lie about his employment status, as he was in fact an employee. The

movant in *Ellenburg* attempted to obtain a benefit for which he undoubtedly was not eligible due to his age. Second, granting benefits in this case would not allow Marquez to "gain[] from wrongdoing or . . . escap[e] its consequences." *Equity* § 126, at 605. The consequences of working without authorization do not include the denial of earned wages or benefits, but rather relate to immigration matters. Finally, applying the clean hands doctrine in cases like this would be contrary to public policy requiring employers to not violate employment law as to undocumented workers. The clean hands doctrine does not bar recovery in this case.

## B.    Merits of the Claim

Avera's claim to benefits turns on whether Marquez was an "employee" of Meadowvale, and whether his alleged fraud – submitting a false social security number because he did not have permission to work in the United States – cancelled his status as an employee. For the following reasons, I find that Meadowvale's decision to rescind benefits plainly violated the Plan.

First, the language of the plan clearly establishes that Marquez is an employee. "Ordinarily, courts are to enforce the plain language of an ERISA plan 'in accordance with its literal and natural meaning.'" *Admin. Cmtee. of Wal-Mart Stores, Inc. Ass. Health and Welfare Plan v. Shank*, 500 F.3d 834, 838 (8th Cir. 2007 (citing *United McGill Corp. v. Sinnett*, 154 F.3d 168, 172 (4th Cir. 1998). The "Eligibility for Participation" section of the Plan states:

> A full-time Employee of [Meadowvale] who regularly works 30 or more hours per week will be eligible to enroll for coverage under this Plan once he/she completes a waiting period of 60 days from the date he or she completes one hour of service with [Meadowvale] . . .

Doc. No. 17-1 at 15. Part-time, temporary, leased and seasonal employees, as well as independent contractors, are excluded from the Plan. *Id.* at 15. Marquez was a full-time employee. Nothing in the above language excludes employees who are not actually authorized to work. Further, ERISA does not exclude non-citizens or limit relief to those

who are authorized to work. *See* 29 U.S.C. §§ 1002(6), 1003(b) (defining "employee" as "any individual employed by an employer."). No reasonable person could conclude that Marquez was not an employee simply because it was not legal for Meadowvale to hire him, when Meadowvale actually did hire him and pay him for his work.

Interpreting the Plan to exclude persons Meadowvale "could not legally have employed" ignores both the plain language of the Plan and the plain reality that Meadowvale did in fact employ Marquez – whether lawfully or not. The Eighth Circuit Court of Appeals has held that "employers who unlawfully hire unauthorized aliens must otherwise comply with federal employment laws." *Lucas v. Jerusalem Cafe, LLC*, 721 F.3d 927, 933 (8th Cir.) (addressing claims under the Fair Labor Standards Act (FLSA)), *cert. denied*, 134 S. Ct. 1515 (2013). The court found no reason why an employer should be exempted from paying the same wages to unlawfully hired workers that would be owed to lawful employees. *Id.* As the court explained:

> Holding employers who violate federal immigration law and federal employment law liable for both violations advances the purpose of federal immigration policy by "offset[ting] what is perhaps the most attractive feature of [unauthorized] workers—their willingness to work for less than the minimum wage."

*Id.* at 936 (quoting *Patel v. Quality Inn S.*, 846 F.2d 700, 704 (11th Cir. 1988). Thus, "aliens, authorized to work or not, may recover unpaid and underpaid wages under the FLSA." *Id.* at 933.

Meadowvale, however, contends that Marquez disqualified himself from coverage under the Plan by committing fraud in the form of misrepresenting his identity. As noted above, the Plan language permits the retroactive termination of coverage based on "an intentional misrepresentation of material fact." Doc. No. 17-1 at 14. This provision is consistent with applicable case law providing that ERISA plans may be rescinded if coverage was "procured through the material misstatements or omissions of the insured." *Shipley v. Ark. Blue Cross and Blue Shield*, 333 F.3d 898, 902 (8th Cir. 2003). However, a statement or omission is "material" only "where knowledge of the true facts would

20

have influenced the insurer's decision to accept the risk or its assessment of the premium amount." *Id.* at 905. In *Shipley*, the denial of coverage was upheld because the record established that the employee's misrepresentations, which were related to his medical history, directly affected the cost to insure him. *Id.* at 905-06.

Here, by contrast, Meadowvale put forth no evidence to suggest that it would have been more expensive to provide health insurance to an undocumented immigrant, or that Marquez' immigration status had any bearing on its decision to insure him under the Plan.[4] Instead, Meadowvale argues that knowledge of his immigration status would have impacted its decision to *hire* Marquez. Coverage under the Plan does not depend on whether Marquez was a wise or legal hire – it depends on whether he was an employee.[5]

This court addressed a similar situation in *Garcia-Moreno v. Great-West Life and Annuity Ins. Co.*, 402 F. Supp. 2d 1031 (N.D. Iowa 2005). In that case, the ERISA plan at issue was a life insurance plan. As Judge Zoss explained:

> An employee of Tur–Pak known to the company as Juan Alberto Chavez ("Chavez") enrolled in the Plan effective May 1, 2003. On the enrollment form, "Chavez" listed his Social Security Number as XXX–XX–XXXX, and his date of birth as September 30, 1980. Chavez named "Elias Garcia," described on the form as his "frend [sic]," as his beneficiary.
>
> The plaintiff Elias Garcia–Moreno ("Garcia–Moreno") was the father of Orlando Garcia. On October 22, 2003, Garcia–Moreno filed a claim under the Plan for $15,000 in life insurance benefits arising from the death of Orlando Garcia. On the "Life Claim Report" form, Garcia–Moreno stated his son was known to Tur–Pak as "Juan Alberto Chavez."

---

[4] Meadowvale has put forth no evidence to suggest that Marquez' immigration status affects his insurability. Indeed, Meadowvale did not ask Marquez any questions about his health history or prior medical treatments at all. The sole issue in deciding to enroll him in the Plan was whether he was an employee.

[5] A number of district courts have reached the same conclusion. *See Trs. of the Pavers v. M.C. Landscape Grp., Inc.*, No. 12CV834CBA VMS, 2016 WL 1238233, at *2 (E.D.N.Y. Mar. 29, 2016); *Bay Area Roofers Health and Welfare Tr. v. Sun Life Ass. Co. of Canada*, 73 F. Supp. 3d 1154, 1168 (N.D. Cal. 2014); *Laborers' Pension Tr. Fund-Detroit & Vicinity v. Lange*, No. 03-CV-40240-DT, 2006 WL 891167, at *10 (E.D. Mich. Mar. 27, 2006).

> Great–West's records indicated a "Juan Chavez" was eligible for a $15,000
> life insurance benefit. Garcia–Moreno stated his son had died on June 19,
> 2004. On the form, Garcia–Moreno listed his son's Social Security Number
> as XXX–XX–XXXX, and his son's date of birth as January 18, 1980.

*Id*. at 1032-33.  The undisputed evidence showed that the employee who worked at Tur-Pak under the name of Juan Alberto Chavez was actually Orlando Garcia, "an illegal alien who used false identification documents belonging to Chavez, an Hispanic male of about his same age, to work in the United States." *Id*. at 1040.  Despite the fact that Garcia used a false name and social security number to gain employment, and thus to acquire coverage under the life insurance plan, Judge Zoss found that "[t]he [denial] decision was not supported by substantial evidence, but instead, was reached at the behest of the employer to avoid setting a 'precedent.'"  Thus, he concluded that the Plan "abused its discretion when it denied the plaintiff's claim." *Id*.

Based on the record before me, and in light of Meadowvale's conflict of interest, the same conclusion is mandated here.  Marquez' use of false identification information to obtain employment was not an intentional misrepresentation of *material* fact that would justify the retroactive termination of coverage under the Plan.  Regardless of his true identify, Marquez was an employee of Meadowvale and, therefore, was entitled to coverage under the Plan.  Meadowvale used the fortuity of Marquez' immigration status to avoid expense, not to remedy actual harm caused by a material misrepresentation.  Its decision to deny benefits and retroactively rescind coverage was an abuse of discretion.

## VI.    CONCLUSION

For the reasons discussed above, the decision of the plan administrator rescinding coverage and denying benefits is **reversed.**  Defendants are hereby **ordered** to pay the benefits wrongfully denied under the terms of the Plan, in the sum of $760,713.45, plus interest as allowed by law.  Judgment in favor of the plaintiff shall enter accordingly.

**IT IS SO ORDERED.**

**DATED** this 12th day of April, 2019.

_____
Leonard T. Strand, Chief Judge